LEE, P.J.,
 

 for the Court.
 

 PROCEDURAL HISTORY
 

 ¶ 1. Charles Lepine was convicted in the Circuit Court of Pearl River County of aggravated driving under the influence (DUI) and sentenced to twenty years in the custody of the Mississippi Department of Corrections (MDOC), with five years suspended. Lepine appeals his conviction and sentence alleging the following errors: (1) the amendment of the indictment was erroneous; (2) the trial court erred by denying a continuance after receiving late discovery from the State; (3) an evidentia-ry foundation was not laid for the blood-alcohol-content test results; (4) the trial court erred in allowing opinion evidence from the State’s witness; (5) the trial court erred by failing to qualify the defense witness as an expert; (6) the trial court erred by denying the motion for a mistrial following the State’s disregard of the trial court’s ruling on the inflammatory argument; (7) the State failed to present sufficient evidence on all elements of aggravated DUI, and the verdict was not supported by the weight of the evidence; and (8) the trial court gave an erroneous jury instruction misstating the law on the duty of motor vehicle operators.
 

 ¶ 2. Finding no error, we affirm.
 

 FACTS
 

 ¶ 3. On February 22, 2003, Lepine drove some family members and friends to a Mardi Gras parade in Terrytown, Louisiana. The group, which traveled in Le-pine’s 1985 Buick station wagon, consisted of Lepine and the following nine passengers: Lepine’s wife, Ellen; his two sons, Adam (age sixteen) and Lance (age seven months); his daughter, Rachael; his grandson, Chandler Hill; and his friends: Kenneth Verrett, Sr.; Kenneth Verrett, Jr. (age one month); Frank Verrett; and Gina Stockstill.
 

 ¶ 4. Lepine ingested alcohol during the afternoon and then began driving the group home to Hancock County, traveling on U.S. Highway 43 South. At about 7:30 p.m., while navigating a curve in Pearl River County, Lepine lost control of the vehicle. The station wagon left the roadway, hit a culvert, flipped, and landed 379 feet away from the point at which it left the road. Four people died as a result of
 
 *933
 
 the accident, including Kenneth Verrett, Sr.; Frank Verrett; and babies — Kenneth Verret, Jr. and Lance Lepine.
 

 ¶ 5. Lepine appeared to be visibly intoxicated to the officers who responded to the accident. Officer Roy Jacobson testified that he was the first officer at the scene. When he arrived, emergency medical personnel requested that he remove Lepine from the scene because he was causing a disturbance. Officer Jacobson testified that Lepine refused to leave, and when Officer Jacobson placed his hands on him, Lepine broke away and struck him in the face, neck, and shoulder. With assistance, Officer Jacobson was able to place Lepine under arrest. Officer Jacobson testified that Lepine appeared to be under the influence of alcohol because an odor of alcohol emanated from him.
 

 ¶ 6. Officer Joe Johnson testified from his observations at the scene that Lepine had an odor of an alcoholic beverage coming from him, had slurred speech, and glassy eyes, and after being read his
 
 Miranda
 
 rights, Lepine stated: “I have been drinking and now I’ve killed my baby.” Police recovered a beer can from the floor of the station wagon. The results of a blood-alcohol-content test performed two hours after the accident showed that Le-pine’s blood-alcohol content (BAC) was .09 percent, which is over the legal limit. Officer Jacobson testified that Lepine had nothing to eat or drink between the time of the accident and the time of the blood test.
 

 ¶ 7. Lepine testified. He claimed that he had consumed three beers over the course of the afternoon in Terrytown, but he had stopped drinking at 3:30 p.m. Le-pine said that he began the return trip two hours after consuming the last beer. During the return trip, he ate two hot dogs. Lepine testified that he was traveling at about fifty-five or sixty miles per hour before the accident. Lepine said that he lost control of the car after swerving to miss an approaching car that had crossed the center line. He denied that he had been driving drunk, and he denied that he had assaulted Officer Jacobson.
 

 ¶ 8. Edith Meaux testified that she was traveling north on U.S. Highway 43 when she witnessed the accident. She saw Le-pine’s oncoming car veer off the road, hit a culvert, go airborne, and flip over. Meaux testified that there were no other cars on the road at the time.
 

 ¶ 9. The jury convicted Lepine of aggravated DUI, but it acquitted him of simple assault of a law enforcement officer.
 

 DISCUSSION
 

 I. WHETHER THE AMENDMENT OF THE INDICTMENT WAS ERRONEOUS.
 

 ¶ 10. Lepine contends that the trial court erred by allowing the amendment of his indictment. Lepine originally was indicted on four counts of aggravated DUI, one count for each victim’s death. However, it was pointed out to the trial judge that the accident had occurred prior to the 2004 amendment to Mississippi Code Annotated section 63-11-30(5) which allowed for a separate conviction for each death caused by the drunk driving. At the time of Lepine’s offense, the aggravated DUI statute had been interpreted by the supreme court to criminalize the act of drunk driving rather than the act of killing.
 
 Mayfield v. State,
 
 612 So.2d 1120, 1128 (Miss.1992). Therefore, Lepine could only be convicted of a single count of aggravated DUI although he had killed four people.
 
 Id.
 
 The trial court permitted an amendment to Lepine’s indictment to reflect the law that was in existence at the time of the crime and to charge Lepine with one count
 
 *934
 
 of aggravated DUI for the deaths of all four victims.
 

 ¶ 11. On appeal, Lepine argues that the amendment was impermissible because it was one of substance and not one of form. “In Mississippi, issues of law are reviewed de novo by appellate courts.”
 
 Cridiso v. State,
 
 956 So.2d 281, 285(¶ 8) (Miss.Ct.App.2006) (citing
 
 Jones v. State,
 
 912 So.2d 973, 975(¶ 8) (Miss.2005)). “Because a determination of whether an amendment is one of form or one of substance is a question of law, a court’s decision to allow the amendment of an indictment ‘deserves a relatively broad standard of review.’ ”
 
 Id.
 
 An amendment is permissible if it “does not materially alter facts which are the essence of the offense on the face of the indictment as it originally stood or materially alter a defense to the indictment as it originally stood so as to prejudice the defendant’s case.”
 
 Wilson v. State,
 
 935 So.2d 945, 948(119) (Miss.2006) (quoting
 
 Miller v. State,
 
 740 So.2d 858, 862(¶ 13) (Miss.1999)). Uniform Rule of Circuit and County Court 7.09 states, in pertinent part, that an indictment can only be amended “if the defendant is afforded a fair opportunity to present a defense and is not unfairly surprised.” Lepine contends that he was unable to defend against count one of the amended indictment, which charged him with all four deaths, because it could not be determined whether the jury found him guilty of one death or for the aggregate of all four deaths. Lepine claims that this was impermissible under the statute.
 

 ¶ 12. Contrary to Lepine’s argument, the jury could have found him guilty of the single count of aggravated DUI if it believed him responsible for only one of the deaths or for all four deaths.
 
 Mayfield,
 
 612 So.2d at 1127. Lepine’s defense was that he had not been driving under the influence of alcohol; he testified that he had consumed only three beers hours earlier, and he testified that he had not negligently operated the vehicle. However, Le-pine never disputed that he caused the deaths of his passengers; at the trial, it was undisputed that the wreck was the cause of the death of all four victims. Therefore, the amendment did not materially alter Lepine’s defense.
 

 ¶ 13. Lepine also argues that the indictment was both multiplicitous and violated double jeopardy because it charged all four deaths in one count. There is duplicity in criminal pleadings when there is joinder of two or more distinct and separate offenses in the same count.
 
 United States v. Robin,
 
 693 F.2d 376, 378 (5th Cir.1982) (citing C. Wright,
 
 Federal Practice and Procedure: Criminal
 
 § 142 at 469). Under the statute in effect at the time of the accident, a defendant is guilty of aggravated DUI, whether he caused one death or many, based upon the single act of causing death by negligently operating a vehicle while intoxicated. Miss.Code Ann. § 63-11-30(5) (Rev. 2002);
 
 Mayfield,
 
 612 So.2d at 1127. Therefore, the indictment was proper under the law as it existed at the time of the offense. This issue is without merit.
 

 II. WHETHER THE TRIAL COURT ERRED IN DENYING A CONTINUANCE AFTER RECEIVING LATE DISCOVERY FROM THE STATE.
 

 ¶ 14. Lepine avers that he was not advised until a few days before the trial that the State’s toxicology expert was going to offer an opinion on retrograde extrapolation, which refers to the estimation of the BAC of an individual at a given time based on rates of absorption and dissipation over a period of time.
 
 [1]
 
 At a hearing
 
 *935
 
 on pretrial motions, Lepine requested that the retrograde extrapolation testimony be excluded or, alternatively, a continuance. The court denied the motion to suppress and the motion for a continuance, but it allowed the defense the opportunity to voir dire the State’s expert outside the presence of the jury. The trial court previously had granted Lepine’s request for funds with which to consult a toxicology expert.
 

 ¶ 15. Lepine’s argument that he should have received a continuance after the trial judge denied his motion to suppress is without merit. Lepine was given notice of the retrograde extrapolation testimony on May 25, 2005, and the trial was scheduled for May 29, 2005. However, the trial did not occur until August 22, 2005. Therefore, Lepine was not prejudiced because he actually had three months before the trial to consult a toxicologist to prepare for cross-examination of the State’s toxicology expert. “To warrant reversal on an issue, a party must show both error and a resulting injury.”
 
 Vardaman v. State,
 
 966 So.2d 885, 891(¶25) (Miss.Ct.App.2007). Lepine cannot show any injury that resulted from the denial of his motion for a continuance. Thus, this issue is without merit.
 

 III. WHETHER AN EVIDENTIARY FOUNDATION WAS LAID FOR THE BLOOD-ALCOHOL-CONTENT TEST RESULTS.
 

 ¶ 16. Lepine argues that no proper predicate was laid for the introduction of the blood-alcohol-content test results showing that approximately two hours after the accident, he had a blood-alcohol concentration of .09 percent. He contends that, under
 
 Johnston v. State,
 
 567 So.2d 237, 238 (Miss.1990), the following three-part evidentiary predicate must be laid for the admission of BAC tests: (1) the statutory procedures of Mississippi Code Annotated section 63-11-19 were followed; (2) the operator of the machinery used was certified to conduct the testing procedures; and (3) the accuracy of the machine used was quarterly calibrated and certified. In
 
 Johnston,
 
 the supreme court reversed because there was no evidence that the In-toxilyzer machine was certified.
 
 Johnston,
 
 567 So.2d at 239. Lepine argues that the BAC test results were inadmissible because this three-part evidentiary predicate was not established.
 

 ¶ 17. Lepine’s reliance on
 
 Johnston
 
 is misplaced. In
 
 Jones v. State,
 
 881 So.2d 209, 216(1125) (Miss.Ct.App.2002), this Court distinguished
 
 Johnston,
 
 which involved Intoxilyzer tests, from other testing methods such as a blood analysis, holding that “the procedures used in the analysis must pass a test of reasonableness.” No Intoxilyzer test was used in Lepine’s case. Instead, hospital personnel drew Lepine’s blood and submitted it for blood testing by the Mississippi Crime Laboratory. The results were admitted into evidence at trial through the forensic toxicologist who tested the sample. There was extensive testimony about the forensic toxicologist’s qualifications to perform the tests and about the lab’s procedures and protocols. The three-part
 
 Johnston
 
 predicate was not required for the admission into evidence of Lepine’s BAC test results. The only requirement was one of proof that the procedure was reasonable, and we find that it was adequately established through the trial testimony. Therefore, this issue is without merit.
 

 IV. WHETHER THE TRIAL COURT ERRED IN ALLOWING
 
 *936
 
 OPINION EVIDENCE FROM THE STATE’S WITNESS.
 

 ¶ 18. The trial court accepted the State’s expert, Wendy Hathcock, as an expert in the field of forensic toxicology with expertise in the interpretation and analysis of the effect of alcohol on the body. Hathcock worked for the Mississippi Crime Laboratory as a forensic toxicologist. She testified that she had performed over two thousand tests on blood samples to determine BAC, and she had been qualified as an expert in that field about ten times. Hathcock testified that she performed an alcohol-analysis test on two samples of Lepine’s blood taken approximately two hours after the accident, one taken at 9:35 p.m. and one taken at 9:55 p.m. She tested each sample twice. The 9:35 sample tested at .0972 and .0979. The 9:55 sample tested at .0948 and .0915. Hathcock testified that she arrived at a blood-alcohol concentration of .09 for both the 9:35 and 9:55 samples by rounding the results for each to .09 percent.
 
 [2]
 
 The legal limit was .08 percent. Miss.Code Ann. § 63-11-30(1) (Rev.2002).
 

 ¶ 19. Hathcock further testified that the two samples indicated that Lepine was in the “elimination phase,”
 
 [3]
 
 This was because the sample taken at 9:35 p.m. had a higher blood-alcohol concentration than the sample taken twenty minutes later. At this point, Lepine objected on the basis of foundation to the opinion testimony that he was in the elimination phase. The State attempted to lay a foundation by eliciting testimony about Hathcock’s qualifications to testify about alcohol absorption and elimination. The trial court overruled
 
 the
 
 objection to foundation. Then, Hath-cock opined that it was “possible” that Lepine was in the elimination phase between 9:35 and 9:55. Lepine objected to this testimony on the basis of foundation, and the trial court overruled the objection.
 

 ¶ 20. Then, Hathcock testified that based upon her education and experience at the Mississippi Crime Laboratory, the average elimination rate for alcohol for a person is .015 to .020. Based upon that elimination rate and Lepine’s BAC approximately two hours after the accident, Hathcock testified to a reasonable degree of certainty that Lepine had a BAC of .08 or higher at the time of the accident. Le-pine objected to this testimony as improper because Hathcock had not been certified as an expert in the field of retrograde extrapolation. The trial court overruled the objection because the prosecution had not asked Hathcock to calculate Lepine’s blood-alcohol concentration at the time of the accident. On cross-examination, Hathcock testified that she could only assume from the numbers that Lepine was in the elimination phase, because that conclusion would be affected by any food or beverage he might have consumed after the accident. She testified with scientific certainty that the average person is in the elimination phase within forty-five minutes after their last alcoholic drink.
 

 
 *937
 
 ¶ 21. On appeal, Lepine argues that Hathcock’s testimony that it was “possible” that Lepine was in the elimination phase at the time his blood was drawn was irrelevant and inadmissible under Mississippi Rule of Evidence 702. He also argues that the testimony was unreliable because the testimony that it was “possible” Lepine was in the elimination phase shows that Hathcock did not apply scientific principles and methods reliably to the facts of the case. Lepine avers that this testimony was speculative.
 

 ¶ 22. This Court will not disturb a trial court’s ruling on the admissibility of evidence absent an abuse of discretion.
 
 Ford v. State,
 
 975 So.2d 859, 865(¶ 16) (Miss.2008). “This Court must first determine if the proper legal standards were applied.”
 
 Id.
 
 (citing
 
 Peterson v. State,
 
 671 So.2d 647, 655-56 (Miss.1996) (superceded by statute)). “If the trial coui’t applied an improper legal standard, resulting in prejudice to the accused, then a reversal is warranted.”
 
 Id.
 
 (citing
 
 Peterson,
 
 671 So.2d at 656). The admissibility of expert testimony is governed by Rule 702 of the Mississippi Rules of Evidence. Rule 702 provides:
 

 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
 

 In
 
 Mississippi Transportation Commission v. McLemore,
 
 863 So.2d 31, 39(¶ 23) (Miss.2003), our supreme court adopted a “modified
 
 Datibert”
 
 standard for the admission of expert testimony. The supreme court stated that, for the admission of expert testimony, (1) “the witness must be qualified by virtue of his or her knowledge, skill, experience or education,” and (2) “the witness’s scientific, technical or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue.”
 
 Id.
 
 at 35(¶ 7). “The trial court is vested with a ‘gatekeeping responsibility’ ” when it reviews scientific evidence.
 
 Id.
 
 at 36(¶ 11). To exercise this responsibility, the trial court must determine whether the expert testimony meets a two-pronged inquiry for admissibility: the testimony must be both relevant and reliable.
 
 Id.
 
 “The trial court must make a ‘preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue.’ ”
 
 Id.
 
 (quoting
 
 Daubert v. Merrell Dow Pharms. Inc.,
 
 509 U.S. 579, 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). To meet the relevance prong, the evidence must assist the trier of fact.
 
 Id.
 
 at 38(¶ 16). In assessing the reliability prong, the trial court must focus “solely on principles and methodology, not on the conclusions they generate.”
 
 Id.
 
 at 36-37(¶ 13) (quoting
 
 Daubert,
 
 509 U.S. at 595, 113 S.Ct. 2786). Reliability is to be determined with reference to “a non-exhaustive, illustrative list of reliability factors for determining the admissibility of expert witness testimony,” including:
 

 whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique’s operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.
 

 
 *938
 

 Id.
 
 The reliability inquiry is a flexible one, with the applicability of the factors being dependent upon “the nature of the issue, the expert’s particular expertise, and the subject of the testimony.”
 
 Id.
 

 ¶ 23. In
 
 Smith,
 
 this Court approved the admission, under the modified
 
 Daubert
 
 standard, of forensic toxicology testimony about retrograde extrapolation.
 
 Smith,
 
 942 So.2d at 318(¶ 26). In
 
 Smith,
 
 the defendant’s BAC four hours after the accident was determined to be .13; at the time, the legal limit was .10.
 
 Id.
 
 at 312(¶ 8). Experts for the State and the defense offered opinions on retrograde extrapolation.
 
 Id,,
 
 at 316(¶ 21). The State’s expert testified that Smith’s BAC would have been higher at the time of the accident:
 

 Jochimsen [a state crime lab forensic toxicologist] explained that she applied the known value (Smith’s BAC at 1:00 a.m. on December 2, 2001) to a formula, using average values of human anatomy, physiology, alcohol absorption and elimination rates, and mathematical statistics, to estimate an unknown value (Smith’s BAC at the time of the accident, approximately 9:00 p.m. on December 1, 2001). This calculation formed the basis of her opinion that Smith’s BAC would have been higher at the time of the accident than it was at the time his blood was drawn.
 

 Id.
 
 at 317(¶ 21). The trial court allowed the State’s expert to testify that Smith’s BAC would have been higher at the time of the accident, but the court did not permit testimony estimating the percentage at the time of the accident.
 
 Id.
 
 at 317(¶ 24). The trial court also permitted competing testimony from a defense expert.
 
 Id.
 
 We found that the trial court properly exercised its gatekeeping function in the admission of the testimony by finding that the testimony was relevant, and it was based upon scientifically reliable facts, data, and methods.
 
 Id.
 
 at 318(¶ 26).
 

 ¶ 24. We find that there was no abuse of discretion in the admission of Hathcock’s opinion that Lepine “possibly” was in the elimination phase. The fact that Hathcock testified to a “possibility” that Lepine was in the elimination phase did not render her testimony irrelevant and unreliable. Hathcock testified that based upon the two BAC values taken at 9:35 p.m. and 9:55 p.m., Lepine’s body had begun eliminating alcohol. Hathcock qualified her opinion with the testimony that whether or not Lepine was in the elimination phase depended on whether he had eaten or drunk anything before his blood was drawn. Other trial testimony established that he had not consumed any food or beverage after the accident. Hath-cock’s testimony assisted the trier of fact in assessing the likelihood that Lepine’s BAC was over the legal limit at the time of the accident. The “possibility” language did not render the conclusion unreliable. There was evidence supporting the trial court’s finding that Hathcock’s testimony was based upon sufficient scientific facts or data, which included: (1) the time of the accident, (2) the time of the two blood draws, and (3) the blood-alcohol levels of the two blood draws. Hathcock testified that this information, along with reasonable assumptions based upon the average man, was all that was needed to formulate her opinion that Lepine was in the elimination phase, depending on whether he had consumed food or had drunk anything after the accident.
 

 ¶ 25. Finally, we note that Hathcock’s testimony that Lepine was in the elimination phase at the time of the blood draws was not substantially prejudicial in light of the fact that Lepine’s BAC two hours after the accident was over the legal limit, and Lepine testified that he had not ingested
 
 *939
 
 any alcohol since consuming beer that afternoon. Thus, there was evidence supporting the intoxication element of aggravated DUI even without the inference from the retrograde extrapolation testimony that his BAC was even higher at the time of the accident. This issue is without merit.
 

 V. WHETHER THE TRIAL COURT ERRED IN FAILING TO QUALIFY A DEFENSE EXPERT.
 

 ¶ 26. The trial court found defense expert, Dr. Olen Brown, to be qualified in the area of toxicology, but unqualified to render an opinion about retrograde extrapolation. The ruling prevented Dr. Brown from testifying that Hathcock’s calculations and opinions were unreliable and not scientifically sound. Lepine argues that the exclusion of Dr. Brown’s testimony was error because he was, in fact, qualified. Lepine points to Dr. Brown’s multiple certifications in toxicology from accrediting boards, to his publications, and to his testimony that he was familiar with the mechanism, process, and factors that go into retrograde extrapolation.
 

 ¶ 27. “The general standard of review for the admissibility of qualifications of an expert to testify to areas of scientific knowledge is abuse of discretion.”
 
 Holland v. State,
 
 705 So.2d 307, 341 (¶ 127) (Miss.1997) (citing
 
 Hall v. State,
 
 611 So.2d 915, 918 (Miss.1992)). “The threshold question of whether a proposed expert witness has the requisite credentials to offer opinion evidence helpful to the jury, whether obtained through education or experience, lies with the trial court.”
 
 Langdon v. State,
 
 798 So.2d 550, 555(¶ 10) (Miss.Ct.App.2001) (citing
 
 McBeath v. State,
 
 739 So.2d 451, 453-54(¶ 9) (Miss.Ct.App.1999)).
 

 ¶ 28. During Dr. Brown’s voir dire, he testified that he was a toxicologist who specialized in the effects of drugs, alcohol, chemicals, and diseases on the body. Dr. Brown had received three degrees from the University of Oklahoma: a bachelor’s degree in laboratory technology, a master’s degree in bacteriology, and a Ph.D. in microbiology. At the time of the trial, Dr. Brown had current certifications in toxicology from the American Board of Toxicology, in chemistry and chemical engineering from the American Institute of Chemists, and he had previously been certified in forensics by the American Board of Forensic Examiners. Dr. Brown had taught at the University of Missouri for over thirty years in various capacities, including the medical college, the veterinary college, the graduate school, and the cardiovascular research center.
 

 ¶ 29. Although Dr. Brown had never worked in a forensic laboratory specializing specifically in alcohol analysis nor testified in court as to retrograde extrapolation, he had been in charge, as a professor at the University of Missouri, of the chromatography laboratory, which is the type of laboratory that conducts the analysis of blood-alcohol samples. The trial court determined that Dr. Brown was not qualified because he had no “specificity in alcohol analysis.... He also stated that he has never analyzed blood-alcohol samples.” The trial court recognized that he was board certified in “toxicology” but not in “forensic toxicology.” The trial court refused to allow Dr. Brown to testify as to retrograde extrapolation of alcohol.
 

 ¶ 30. Reiterating Rule 702, a witness is “qualified as an expert by knowledge, skill, experience, training, or education” and may offer opinions if his or her “scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue.” However, the expert witness must limit such opinion testimony “to
 
 *940
 
 matters within his demonstrated area of expertise.”
 
 Cowart v. State,
 
 910 So.2d 726, 730(¶ 16) (Miss.Ct.App.2005) (quoting
 
 Gen. Motors Acceptance Corp. v. Baymon,
 
 732 So.2d 262, 272(¶ 49) (Miss.1999)). The content of the testimony must be relevant and reliable under the modified
 
 Daubert
 
 standard.
 
 See id.
 
 at 730(¶ 17).
 

 ¶ 31. Dr. Brown was clearly qualified to testify as an expert in the area of toxicology, including retrograde extrapolation of alcohol. Dr. Brown testified that he was “familiar with the mechanism, the process, and the factors that go into retrograde extrapolation,” and his “experience was with extrapolating the concentration of substance in the human body” and the effect of various concentrations of drugs, including alcohol, have on the body. Dr. Brown further explained that the interaction of drugs in the human body varies with concentration and elimination from metabolism, absorption, and distribution— which also make up the general principles of toxicology and are applicable to alcohol. The content of Dr. Brown’s testimony would be reliable and relevant so as to meet the
 
 Daubert
 
 standard.
 

 ¶ 32. Although we find error in the trial court’s exclusion of Dr. Brown’s testimony, we must now determine whether this exclusion was reversible error or harmless error. To find reversible error, we must not only find that the trial court abused its discretion, but also that the exclusion of Dr. Brown’s expert testimony caused Lepine prejudice or adversely affected Lepine’s substantial rights.
 
 Fortune v. State,
 
 766 So.2d 827, 829(¶ 6) (Miss.Ct.App.2000). “An error is harmless only when it is apparent on the face of the record that a fair[-]minded jury could have arrived at no other verdict than that of guilty.”
 
 Id.
 
 (quoting
 
 Bishop v. State,
 
 761 So.2d 894, 898(¶ 12) (Miss.Ct.App.2000)).
 

 ¶ 33. After a careful review of Dr. Brown’s proffered testimony, it is apparent that, even if the trial court had allowed Dr. Brown to testify as an expert, Dr. Brown’s expert testimony did not tend to exculpate Lepine. Dr. Brown essentially testified that it was “scientifically unreliable” to apply retrograde extrapolation to arrive at Lepine’s precise BAC at the time Lepine lost control of his vehicle. Dr. Brown explained that the elimination rate or “the rate at which'alcohol decreases in a body, in a person, can vary by as much as 400 percent.” In other words, Dr. Brown testified that one could not reliably determine Lepine’s BAC at the time of the incident without first determining a benchmark of the rate at which Lepine metabolizes alcohol. The exclusion of Dr. Brown’s expert testimony would have prejudiced Lepine only if it tended to exculpate Lepine by demonstrating that his BAC was less than the legal limit at the time of the wreck.
 

 ¶ 34. Lepine took the stand after Dr. Brown’s proffer and his testimony effectively rendered the exclusion of Dr. Brown’s testimony harmless. Lepine claimed he had consumed three beers, but he had stopped drinking at approximately 3:30 p.m., two hours before Lepine began his return trip. Lepine testified that, during the return trip, he ate two hot dogs.
 

 ¶ 35. Lepine’s blood was first drawn at 9:35 p.m. — approximately two hours after he lost control of his vehicle and at least five hours after Lepine claimed to have consumed his last beer. Hathcock performed a BAC on that blood sample, and the results were .0972 and .0979. Lepine’s blood was drawn twenty minutes later at 9:55. Hathcock performed a BAC test on the sample and the results were .0948 and .0915. According to Hathcock, an average person is in the “elimination phase” by the time his blood is drawn, meaning that Le-pine was metabolizing alcohol or voiding it
 
 *941
 
 through urine elimination, sweat, or breath. Hathcock stated that the BAC of a person in the elimination stage is lower than one’s BAC at the time he stops drinking. Hathcock also testified that, to a scientific certainty, the average person is in the elimination phase within forty-five minutes of their last alcoholic drink.
 

 ¶ 36. Dr. Brown’s proffered testimony tends to attack the credibility of Hath-cock’s retrograde extrapolation methodology, but it does not in any manner indicate that Lepine’s BAC was below .08 at the time of the accident. The jury could only conclude that Lepine’s BAC at the time of the wreck was greater than .08 because: (1) two hours after the incident, Lepine’s BAC was greater than .09; (2) Lepine testified that he did not drink any alcohol within an hour or two before he began the return trip home; and (3) Lepine testified that he did not drink anything between the time of the accident and the time the blood samples were drawn. Based on Lepine’s testimony that he did not consume any alcohol after approximately 3:30 p.m., no portion of Dr. Brown’s testimony tended to infer that Lepine’s BAC would have been below the legal limit of .08 at the time he lost control of his vehicle. Consequently, although the trial court erred in failing to qualify Dr. Brown as an expert, the error is harmless because Dr. Brown’s proffered testimony did not prejudice Lepine or adversely affect his substantial rights.
 

 VI. WHETHER THE TRIAL COURT ERRED IN DENYING LE-PINE’S MOTION FOR A MISTRIAL FOLLOWING THE STATE’S DISREGARD OF THE TRIAL COURT’S RULING ON THE INADMISSIBLE ARGUMENT.
 

 ¶ 37. This issue concerns Le-pine’s motion for a mistrial. The issue arose when the State asked its accident reconstructionist, Sergeant James Kelly, if he was able to formulate the speed that Lepine was traveling at the time of the accident to a reasonable degree of certainty. Lepine objected arguing that the information was not contained in the officer’s report that was disclosed to the defense.
 

 ¶ 38. The court discussed the matter in the presence of the jury. During the discussion, Sergeant Kelly informed the court that there were too many variables to make an accurate calculation of a particular speed. The prosecutor contended that Sergeant Kelly was only expected to testify as to whether Lepine exceeded the speed limit based on the distances the vehicle traveled in the accident, and he noted that these distances had been provided to Lepine in discovery. At this point, Lepine asked that the jury be excused and requested a mistrial based on the prosecutor’s statement. The trial court concluded that because the testimony on speed was not in the report, it was inadmissible. The trial court denied the requested mistrial. Lepine waived admonishment of the jury to ignore the statements.
 

 ¶ 39. This Court will reverse the denial of a mistrial if there has been an abuse of discretion by the trial judge.
 
 Rollins v. State,
 
 970 So.2d 716, 720(¶ 10) (Miss.2007). A mistrial is not warranted every time the jury is exposed to inadmissible evidence.
 
 Reed v. State,
 
 764 So.2d 511, 514(¶ 12) (Miss.Ct.App.2000). The trial court may only grant a mistrial “when the harm done would render the defendant without hope of receiving a fair trial.”
 
 Id.
 
 at 513(¶ 7). A mistrial is appropriate when misconduct by a party creates “substantial and irreparable prejudice.” URCCC 3.12.
 

 ¶ 40. Lepine argues that he was entitled to a mistrial because the prosecutor’s remark about distances insinuated to the jury that the State had proper evidence, but the defense sought to hide it from the
 
 *942
 
 jury. In support of his argument, Lepine cites to
 
 Williams v. State,
 
 539 So.2d 1049, 1051 (Miss.1989), in which the trial court excluded a videotape that the State had neglected to provide to the defense in discovery. The prosecutor continued to move for introduction of the videotape in disregard of the trial court’s ruling.
 
 Id.
 
 The supreme court found that the prosecutor’s repeated references to the videotape were prejudicial and reversed and remanded for a new trial.
 
 Id.
 
 at 1052.
 

 ¶ 41.
 
 Williams
 
 is distinguishable from the instant case. In
 
 Williams,
 
 the State made repeated references to the already excluded evidence.
 
 Id.
 
 It was the State’s repeated disregard for the trial court’s ruling that led the supreme court to find that Williams was denied a fair trial.
 
 Id.
 
 In this case, the prosecutor made a single argument seeking to admit the testimony on the general speed of the vehicle. The supreme court in
 
 Williams
 
 stated that the prosecutor is allowed to argue the admissibility of proposed evidence without denying the defendant a fair trial.
 
 Id.
 
 at 1051. In this case, we find that the statement by the prosecutor was not so prejudicial that the trial court abused its discretion by denying a mistrial. Therefore, this issue is without merit.
 

 VII. WHETHER THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE ON ALL OF THE ELEMENTS OF THE AGGRAVATED DUI, AND WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.
 

 ¶ 42. Lepine challenges the weight and sufficiency of the evidence supporting his guilt of aggravated DUI under Mississippi Code Annotated section 63-11-30(5). In determining whether the evidence is sufficient to sustain a conviction, “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ ”
 
 Bush v. State,
 
 895 So.2d 836, 843(¶ 16) (Miss.2005) (quoting
 
 Carr v. State,
 
 208 So.2d 886, 889 (Miss.1968)). If, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, the essential elements of the crime existed, this Court will affirm the denial of a motion for a judgment notwithstanding the verdict.
 
 Id.
 
 (quoting
 
 Jackson v. Virginia,
 
 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). But if the facts and inferences, so considered, point in favor of the defendant on any element of the offense with sufficient force that no reasonable juror could have found guilt beyond a reasonable doubt, then we must reverse and render.
 
 Id.
 
 (quoting
 
 Edwards v. State,
 
 469 So.2d 68, 70 (Miss.1985)).
 

 ¶ 43. On review of the weight of the evidence, “we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Id.
 
 at 844(¶ 18). This Court takes the position of the thirteenth juror, meaning that we will reverse if, weighing the evidence in the light most favorable to the verdict, we “disagree! ] with the jury’s resolution of the conflicting testimony.”
 
 Id.
 
 However, we will grant a new trial “only in exceptional cases in which the evidence preponderates heavily against the verdict.”
 
 Id.
 
 (quoting
 
 Amiker v. Drugs for Less, Inc.,
 
 796 So.2d 942, 947(¶ 18) (Miss.2000)).
 

 ¶ 44. The statute proscribing aggravated DUI in effect at the time of Lepine’s offense stated:
 

 (5) Every person who operates any motor vehicle in violation of the provision of
 
 *943
 
 subsection (1) of this section and who in a negligent manner causes the death of another ... shall, upon conviction, be guilty of a felony and shall be committed to the custody of the State Department of Corrections and for a period of time not less than five (5) years and not to exceed twenty-five (25) years.
 

 Miss.Code Ann. § 63-11-30(5) (Rev.2002). Lepine argues that the State presented no evidence that he operated a motor vehicle in a negligent manner.
 

 ¶ 45. “[T]he State must prove that [a defendant] not only consumed alcohol prior to the accident, but that he performed a negligent act that caused the death of another.”
 
 Joiner v. State,
 
 835 So.2d 42, 43-44(¶ 5) (Miss.2003) (citing
 
 Hedrick v. State,
 
 637 So.2d 834, 837-38 (Miss.1994)). “It has been made clear that § 63-11-30(5) ‘contains no requirement that the negligence has to be caused by the alcohol.’ ”
 
 Id.
 
 at 44(¶ 5) (citing
 
 Ware v. State,
 
 790 So.2d 201, 216(¶52) (Miss.Ct.App.2001)). Mississippi Code Annotated section 63-11-30(5) only requires simple negligence — not gross or culpable negligence.
 
 Holloman v. State,
 
 656 So.2d 1134, 1140 (Miss.1995). It is elementary in tort law that a person is negligent for failing to maintain control over the vehicle he is driving.
 
 Robertson v. Welch,
 
 242 Miss. 110, 117, 134 So.2d 491, 493 (1961).
 

 ¶ 46. Meaux testified that she saw Lepine’s vehicle veer off the road, and she saw no other vehicles on the road in that area at the time of the accident. Viewing these facts in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that Lepine operated his vehicle in a negligent manner. Furthermore, the evidence did not preponderate so heavily against the verdict that allowing the verdict to stand would sanction an unconscionable injustice. The evidence is also of such a nature that a reasonable trier of fact could have found, beyond a reasonable doubt, that all of the essential elements of the crime existed. Accordingly, the evidence, when viewed in the light most favorable to the State, was legally sufficient. This issue is without merit.
 

 VIII. WHETHER THE TRIAL COURT GAVE AN ERRONEOUS JURY INSTRUCTION ON THE DUTY OF MOTOR VEHICLE OPERATORS.
 

 ¶ 47. In his final issue, Lepine argues that the trial court gave an erroneous jury instruction that misstated the law concerning the duty of motor vehicle operators. The jury instruction, S-5, stated: “The court instructs the jury that at all times a driver of a vehicle is required to maintain easy and reasonable control of his vehicle.” Lepine argues that the instruction misstated the law because requiring that the operator maintain “easy” control results in someone being negligent when maintaining control of a vehicle, though with difficulty, as when traveling over an icy road. In other words, Lepine contends that including the word “easy” in the jury instruction would make it negligent for someone to have difficulty maintaining control over his vehicle, even if the difficulty was through no fault of his own.
 

 ¶ 48. The State contends that Lepine failed to preserve this issue for appeal. At the jury instruction conference, Lepine remained silent during the granting of the State’s instructions. After two defense instructions were refused, Le-pine’s counsel stated:
 

 I need to make some objections to the ones [jury instructions] that were granted on the State’s behalf. Well, the defendant would object to the submission of any of the instructions provided by the State that referred to negligent acts
 
 *944
 
 on his behalf, as there were no negligent acts proved.
 

 This objection was a general objection to any of the State’s jury instructions which referred to negligence. Lepine’s ground for the objection to the negligence instructions was that they lacked evidentiary support because there was no proof that Le-pine had committed any negligent acts. The law pertaining to objections to jury instructions is as follows:
 

 Generally, when a jury instruction is offered at trial, it is the duty of the opposing party, in order to preserve the point for appeal, to state a contemporaneous objection in specific terms.
 
 Nunnally v. R.J. Reynolds Tobacco Co.,
 
 869 So.2d 373, 378 (Miss.2004);
 
 Young v. Robinson,
 
 538 So.2d 781, 783 (Miss.1989);
 
 see also Holifield v. State,
 
 431 So.2d 929, 930 (Miss.1983) (general objection to jury instruction does not suffice to preserve issue for appeal). Furthermore, on appeal a party may not argue that an instruction was erroneous for a reason other than the reason assigned on objection to the instruction at trial.
 
 Young,
 
 538 So.2d at 783.
 

 Irby v. State,
 
 893 So.2d 1042, 1047(¶ 17) (Miss.2004). Based on this precedent, we find this issue is procedurally barred.
 

 ¶ 49. Notwithstanding the procedural bar, we find that the jury instructions fairly and adequately state the law of negligence. On review of a challenge to a jury instruction, “[w]e will not find reversible error where the instructions actually given, when read together as a whole, fairly announce the law of the case and create no injustice.”
 
 Ford,
 
 975 So.2d at 864(1111) (quoting
 
 Adkins v. Sanders,
 
 871 So.2d 732, 736(¶9) (Miss.2004)). In
 
 Comby v. State,
 
 901 So.2d 1282, 1288(¶ 14) (Miss.Ct.App.2004), the trial court granted a jury instruction on negligence that contained the “easy and reasonable control” language. Comby challenged the instruction, claiming that it placed a higher standard of care on him by requiring him to maintain easy and reasonable control of his vehicle at all times.
 
 Id.
 
 at (¶ 15). We found no error in the granting of the instruction, stating:
 

 Defects in specific instructions do not require reversal where all instructions taken as a whole fairly — although not perfectly' — announce the applicable primary rules of law. When taken as a whole, the instructions did not place a higher standard of care on Comby as a driver. The jury was adequately and properly instructed as to Comby’s duty to drive in a reasonably safe manner.
 

 Id.
 
 (internal citation and quotations omitted).
 

 ¶ 50. As in
 
 Comby,
 
 the jury instructions in this case, when read as a whole, show that the jury was adequately and properly instructed on the law of negligence. Besides the “easy and reasonable control” instruction, the jury was instructed that negligence was the failure to use reasonable care, defined as “that degree of care which a reasonably careful person would use under like or similar circumstances.” The jury was further instructed that “negligence may consist either in doing something that a reasonably careful person would not do under like or similar circumstance or in failing to do something that a reasonably careful person would do under like or similar circumstance.” We find that any defect in instruction S-5 created no error because the negligence instructions, when read as a whole, adequately instructed the jury on the standard of care applicable to Lepine. This issue is without merit.
 

 ¶ 51. THE JUDGMENT OF THE CIRCUIT COURT OF PEARL RIVER COUNTY OF CONVICTION OF AGGRAVATED DRIVING UNDER THE
 
 *945
 
 INFLUENCE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH FIVE YEARS SUSPENDED AND TO PAY $8,326 IN RESTITUTION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PEARL RIVER COUNTY.
 

 KING, C.J., MYERS, P.J., IRVING, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ, CONCUR. CARLTON, J., CONCURS IN RESULT ONLY.
 

 [1]
 

 . In an earlier case, we described "retrograde extrapolation” as "the process of predicting
 
 *935
 
 an earlier unknown value by calculating a known later value with a series of generally used average values, and projecting that re-suit back in time.”
 
 Smith v. State,
 
 942 So.2d 308, 312(¶ 8) (Miss.Ct.App.2006).
 

 [2]
 

 . Mississippi Code Annotated 63-11-8(1) (Rev.2004) provides for a blood, breath, or urine test for determining drug or alcohol content to be performed on the operator of any motor vehicle involved in an accident that results in death. Any blood withdrawal should be performed within two hours after the accident, if possible.
 
 Id.
 
 No issue is raised on appeal concerning the timing of Lepine's blood withdrawal.
 

 [3]
 

 . Hathcock testified that a person is in the elimination phase when the person's body is metabolizing alcohol or voiding it through urine, sweat, or breath. Hathcock testified that the BAC of a person in the elimination phase would
 
 be
 
 lower than
 
 it had been
 
 at the time the person stopped drinking alcohol.